UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ISLAND CONCEPTS, LLC D/B/A/ FRIENDS COASTAL RESTAURANT | CIVIL ACTION NO. 13-6725 |
| | SECTION "R" |
| VERSUS | |
| | JUDGE SARAH S. VANCE |
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON D/B/A/ LLOYD'S SUBSCRIBING INSURER NUMBER 4242 | MAGISTRATE JUDGE KAREN WELLS ROBY |

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

This matter arises out of the hurricane damage and loss of the historic "Friends Coastal Restaurant" that was located on the Tchefuncte River in Madisonville, Louisiana. The owner of the restaurant is Island Concepts, LLC, and both entities are insureds under the policy of insurance provided by Lloyd's. The property was insured through Underwriters at Lloyd's, and more particularly under Subscribing Insurer Number 4242 (Exhibit A).

As a result of Hurricane Isaac the restaurant was damaged. It was thereafter inspected by adjusters and engineers to determine the damage to the structure and the loss of contents. The restaurant also made a claim under the Lloyd's policy for loss of business income, or business interruption.

1

The claims for the structure and the contents were resolved, but because the damage to the property was significant, the business shut down for an extended period of time, and ultimately it was decided that the restaurant would need to be repaired and rebuilt.

After an initial adjustment of the general claim and initial business income claim, Lloyds paid the business income loss sporadically.   The payments were: $75,000.00 on 09/09/12; $58,898.15 on 11/04/12; $30,661.05 on 12/02/12; $111,763.32 on 03/18/13; and $59,050.06 on 04/05/13. Following that payment Lloyds refused any further payment, and Friends demanded appraisal under the policy of insurance.  The parties retained their own appraisers, but could not come to an agreement as to the total amount of the loss of business income.  When that impasse occurred, the appraisers selected an umpire to resolve their dispute as to the amount of the loss of business income.  Charles Theriot, a CPA was selected as the umpire, and both parties submitted their positions including the accounting procedures utilized by each party.  The submission of Friends included a spreadsheet of the accounting procedures used by the restaurant, and the projected loss of business income (Exhibit B).

On May 6, 2014 the umpire rendered his decision and found that the insurance company's (referred to as MDD in the award report), "calculation of the business interruption claim for the primary loss period is reasonably accurate.  The insured's calculations for the preliminary loss period are not correct."   His decision further concluded that, "No consideration was made of the causation of the extended claims adjustment period beyond the extended restoration/loss period date." (Exhibit C).

2

The total amount awarded to the insured by the umpire was $442,878.00 less the previous amounts paid by the insurer.  Acknowledging the covered peril under their policy Lloyd's paid the Business Loss in previous amounts totaling $335,372.64. Lloyds has tendered the additional amount of business loss awarded by the umpire totaling $107,505.36.

During the appraisal process Friends initiated this lawsuit seeking the recovery of the Business Loss and Penalties as a result of Lloyd's denial and delay of the ongoing loss of income to the business.  This matter is set as a bench trial before Your Honor on November 10, 2014.

Lloyds has now brought a Motion for Summary Judgment seeking to enforce the final decision of the umpire.  As will be discussed below in more detail, the motion should be denied as the umpire exceeded his authority by both usurping the judicial responsibility of interpreting insurance contracts, and by misreading the policy terms in reaching his decision.  The erroneous approaches by the umpire should not be enforced as they are decisions that remain legal disputes, and should be resolved by the court at the trial of this matter.

I.     APPRAISAL

The appraisal process is unique to insurance contracts.  Unlike arbitrations, the appraisal process is based on the agreement by the parties contained in the policy of insurance:

2. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

This portion of the policy does not divest a court of jurisdiction, as compared to a binding arbitration. Additionally, "questions about coverage … are not waived by an appraisal clause." *AIU v. Lexes*, 815 A.2d 312 (Del. 2003), citing to *McIntosh v. Hartford Fire Ins. Co.*, 106 Mont. 434, 78 P.2d 82 (1938); *In Re Waters*, 93 F.2d 196 (5th Cir. 1937); *Firemen's Fund Ins. Co. v. Flint Hosiery Mills, Inc.*, 74 F.2d 533 (4th Cir. 1935); *Lakewood Manufacturing Co. v. Home Ins. Co. of N.Y.*, 24 Ohio Misc. 244, 422 F.2d 796 (6th Cir.1970); *Atlas Construction Co., Inc. v. Indiana Ins. Co., Inc*., 160 Ind.App. 33, 309 N.E.2d 810 (1974).

The core question in reviewing appraisals is whether the appraisers or the umpire fulfilled the directives within the policy of insurance. If the decision through appraisal deviates from the policy in determining the value of the loss, then the appraisal is unenforceable. Stated another way, "In order for the award of the appraisers to be binding, it must clearly appear that they have performed the duties required of them by the policy, which is the law between the parties." *Fourchon Docks, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., No. 86–2267, 1988 WL 32938, at *7 (E.D.La. Apr. 6, 1988).

4

In the case of *Dufrene v. Certain Interested Underwriters at Lloyd's of London Subscribing to Certificate No. 3051393*, 91 So.3d 397, 400 (La.App. 5th Cir. 2012), *writ denied,* 90 So.3d 1065 (La. 2012), the Louisiana Fifth Circuit explained the continued involvement of the court in the appraisal process:

> Appraisal clauses, such as the one in this case, are enforceable under Louisiana law, but they do not deprive a court of jurisdiction over the matter. See *St. Charles Parish Hospital Service Dist. No. 1 v. United Fire and Casualty Co.,* 681 F.Supp.2d 748, 753 (E.D.La. Jan.13, 2010). The Louisiana Civil Code sets forth guiding principles for construing contracts. *Id.; Cadwallader v. Allstate Ins. Co.,* 848 So.2d 577, 580 (La. 2003). An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code. *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.,* 630 So.2d 759, 763  (La. 1994); *Smith v. Matthews,* 611 So.2d 1377, 1379 (La.1993). The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. LSA–C.C. art. 2045; *Huggins v. Gerry Lane Enterprises, Inc.,* 957 So.2d 127, 129 (La. 2007). Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. LSA–C.C. art. 2047; *LeBlanc v. Aysenne,* 921 So.2d 85, 89 (La. 2006).
>
> In the present case, the insurance policy contains an appraisal provision that does not set forth specific guidelines as to how the appraisal process is to be conducted. Although the appraisal process is generally not bound by all of the rules and procedures of a court proceeding, the appraisal provision in the insurance policy does provide for the involvement of the trial court in order to appoint an umpire if the appraisers cannot agree on one. Thus, some involvement of the courts is contemplated by the plain meaning of the words in the appraisal provision, and the language of the insurance policy does not restrict or limit the court's involvement.

In the case of Friends Restaurant, the policy of insurance provides the primary focus of the intent of the parties, and the court in scrutinizing an appraisal decision.

Some courts have made comparisons of appraisal and arbitrations.  In the case of *Musso's Corner, Inc. v. A&R Underwriters, Inc.*, 539 So.2d 915 (La.App. 4th Cir.

1989), the actual appraisal clause used the term "arbitration" to complete the appraisal process.  In that case the court then used Louisiana statutory provisions to determine whether an appraisal could be overturned.  In the case of *Farber v. Am. Nat'l Prop. & Cas. Co.*, 999 So.2d 328 (La.App. 3rd Cir. 2008), the Louisiana Third Circuit cited to *Musso's Corner* in comparing the appraisal clauses, and used the arbitration statute, LSA-R.S. 9:4210 in declining to overturn an appraisal award based on suggestions of corruption or fraud.

This court also compared the appraisal process to that of an arbitration proceeding, but appropriately distinguished the two in *St. Charles Parish Hospital, supra*.  "The correctness of equating an appraisal with an arbitration, however, is subject to doubt. Again, courts applying Louisiana law have continually made a distinction between the two."  *St. Charles Parish Hosp.,* at p. 760.

While there is a distinction between appraisal and arbitration, the argument that forms the basis of overturning the umpire award in the present case is supported in both the appraisal standards and those found in the arbitration statute.  In the case of the appraisal process, courts, including Your Honor, have found that legal determinations on an insurance policy are left to the court.  In *St. Charles Parish Hospital,* Your Honor retained the legally based decision of whether judicial interest was recoverable under an appraisal award, and removed it from the appraisal decision.  "If plaintiff is indeed entitled to interest on any loss, it is for the Court, and not for the appraisers, to award it."  *St. Charles Parish Hosp.* at p. 759.  The court's removal of the interest award was based on the appraiser's lack of authority to render

that portion of the award. The appraisers essentially exceeded their authority and duties and rendered a decision on a legal issue that only the court could decide.

The plaintiff does not suggest that the appraisal process is the same as an arbitration; however, a persuasive argument can be made that the arbitration statute that provides the basis for rejecting a non-judicial decision is applicable here under LSA-R.S. 9:4210D:

> Where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

This statement is the fundamental argument in support of overruling the appraisal and umpire's decision. The umpire exceeded his power and authority in utilizing his own method of calculating business loss; failing to follow the definition of Business Loss in the policy; failing to follow the policy language on period of restoration; and leaving open the recovery of extended period of restoration provided within the policy. On these specific issues the umpire's decision should be rejected consistent with the holdings in *Fourchon Docks*, *supra*, and *St. Charles Parish Hospital, supra*.

The complainant has identified four decisions made by the umpire where he exceeded his authority: (1) Utilizing an method of accounting that is not expressed in the policy for projecting business income loss; (2) Incorporating his own definition of "Period of Restoration" which was outside the definition contained in the policy; (3) Failing to utilize the definition of "Business Income" in completing his calculations; and (4) In failing to provide, and leaving open, a calculation of "Extended Coverage"

when it was provided for in the policy.  Each of these erroneous decisions on the part of the umpire is addressed below.

## II.    ACCOUNTING METHODOLOGY

On the issue of what method of accounting is to be used in determining the business income loss, the policy does not give specific direction.   Unlike the conditions of co-insurance, and limits of insurance sections, where the policy gives formulas and examples of methods of calculations, the Business Income section does not direct the accounting methodology to be used.  The Loss Determination section reads as follows:

3. Loss Determination

a.   The amount of Business Income loss will be determined based on:

(1)    The Net Income of the business before the direct physical loss or damage occurred;

(2)    The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3)    The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4)    Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

8

Although there is no defined method to determine the business loss under the Lloyd's policy, the policy specifically favors the accounting methods of the insured, by using the insured's "financial records and accounting procedures" as a basis for determining the loss.   In this case the accounting procedures utilized by Friends Restaurant was provided to the adjusters for Lloyd's, and to the umpire for the determination of the business income loss.  The CFO of Friends Restaurant submitted the accounting data for the Friends Restaurant in a spreadsheet illustrating the accounting procedures for the restaurant.  (Exhibit C).  Instead of following the terms of the policy on Loss Determination and incorporating the insured's accounting practices, the umpire either used his own methodology, or seemingly used the methodology submitted by Lloyd's.

As is explained in the letter of Patrick Gros, the CPA for the Friends Restaurant, there are several methods of accounting that can be used in calculating a business loss.  One can use the Historic Revenues method, or the Historic Annual Net Profit (Loss) before Tax method; or the Average Revenue method.   Gros explained that the method utilized by Lloyd's is flawed in that "it requires several assumptions concerning normal revenues and expenses, contracts and variations."   In the interpretation of the policy by Gros, he noted historic profits and losses between Period 9 through Period 2 an average profit of $41,353.00 as compared to the adjuster for Lloyd's and the umpire that found a loss of $197,048 for the same time frame. (Exhibit D, page 1, attached as a Declaration pursuant to 28 U.S.C. 1746).

In comparison Gros explained that the Restaurant submitted its accounting method "which averaged historical Net Profit (Loss) before Income Taxes as defined

in the policy." Gros acknowledged that the Restaurant method does not take into account seasonal fluctuations, but he stated that "in trying to find the correct method to use under the policy there is no direction as to whether Net Income should be calculated quarterly, monthly, weekly or daily." He therefore would conclude that "Likely Net Income should be determined over an annual 12 month period or some other reasonably agreed upon method." (Exhibit D – page 2). Gros also suggests a third method that takes the "preceding 26 periods of actual Net Profit (Loss) before Income Taxes, as defined in the policy, and averaging each period. This method takes seasonality by 4 week periods into consideration." It also reduces the projected guesswork as used in the Lloyd's method. (Exhibit D – page 2). Gros also recognized that once the court made the policy determination of the methodology, only then could he accurately conclude the claim amount. The extreme variance in results from different accounting methodologies invite a court's directive on this coverage interpretation.

In typical circumstances for taxes, or profit and loss calculations, a business is free to use whatever method they wish. In the litigation setting; however, courts have consistently imposed restrictions on methods of economic calculations to avoid extreme variances on case-by-case calculations. See *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); *Culver v. Slater Boat Co.*, 688 F.2d 280 (5th Cir.1982) (en banc) (Culver I); *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983) (en banc) (Culver II). Courts also maintain their gatekeeping function for this very purpose by establishing limitations on the experts that testify.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The cited cases imposed the proper methods for a court's (or jury) calculation of economic damage and loss, and also assure that any expert that testified would do so only within the court's gatekeeping authority. In this case it is most appropriate that the court should direct the method of accounting in this case by considering the accounting procedures of the insured along with generally accepted accounting practices.

Where a policy does not provide for the accounting methodology to calculate business income loss under a policy the court should resolve this legal issue, and direct an appropriate accounting method to determine the loss of business income. As this policy question is one of a coverage determination it is most appropriate to be left as a policy interpretation in the trial.

## III.    PERIOD OF RESTORATION

In the decision of the umpire on the question of the "period of restoration" he makes the statement under his Primary Restoration/Loss Period section that, "The definition contained within the insurance policy provides a primary loss period to February 24, 2013, a period of 177 days or 5.86 months." A detailed review and word search for a description as expressed by the umpire is simply not found anywhere in the policy. The specific definition contained in the policy is found at Section F, under Business Income, and states,

3. "Period of restoration" means the period of time that:

a.      Begins:

11

> > (1)    72 hours after the time of direct physical loss or damage for Business Income Coverage; or
> >
> > (2)    Immediately after the time of direct physical loss or damage for Extra Expense Coverage; caused by or resulting from any Covered Cause of Loss at the described premises; and
>
> b.    Ends on the earlier of:
>
> > (1)    The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality;
> >
> > or
> >
> > (2)    The date when business is resumed at a new permanent location.

First, there is no designation in the policy for a "primary loss" as described by the umpire. Although the umpire may have been distinguishing between the "period of restoration" as primary, and the extended coverage as secondary, the definition he uses is simply not contained in the policy and creates further confusion. If he were to have been using a section of the policy to render an award for the period of restoration, then he should have identified it in the policy. Without a clear specification of the terms used to calculate the period of restoration, then the umpire's decision should not be maintained. The question is whether an umpire can ignore a definition under a policy of insurance in rendering an appraisal decision.

In the case of *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp.2d 293, 296 (S.D.N.Y. 2003), the court stated that, "[a] dispute between the parties that 'goes to coverage under the policy and can only be resolved by analysis and application of the policy' is not appropriate for appraisal."

The *Duane Reade I* case was explained in *Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 205 (2d Cir. 2012), and is on point in the context of the present case,

> The Southern District of New York's treatment of this boundary in the context of business income losses is instructive. *Duane Reade, Inc. v. St. Paul Fire & Marine Insurance Co.,* 261 F.Supp.2d 293 (S.D.N.Y.2003) ("*Duane Reade I* ") and *Duane Reade, Inc. v. St. Paul Fire & Marine Insurance Co.,* 279 F.Supp.2d 235 (S.D.N.Y.2003) ("*Duane Reade II* ") concerned a dispute between Duane Reade, Inc., and its insurer St. Paul Fire & Marine Insurance Company, after the destruction, on September 11, 2001, of one of Duane Reade's pharmacies located near the World Trade Center. St. Paul Fire demanded an appraisal to determine the precise scope of the restoration period. The parties disputed the policy's coverage on this point: Duane Reade asserted "a right under the policy to recover business interruption losses for the entire period until the World Trade Center is rebuilt (if it is)," while St. Paul Fire insisted that the "plaintiff's recoverable losses are limited to those suffered within 21 months following the terrorists [sic] attacks." *Duane Reade I,* 261 F.Supp.2d at 294. Thus, the argument in *Duane Reade I* did not concern the factual determination of the restoration period's end date, but whether the policy calculated that period with reference to an exogenous event—the reconstruction of the World Trade Center.

> The district court in *Duane Reade I* appropriately reserved the determination of that legal dispute for itself, rather than delegating it to an appraisal panel. *See also Indian Chef,* 2003 WL 329054, at *3 (concluding that, because the "parties disagree[d] about which provisions of the policy apply to the calculation of lost business income," the question was one of coverage rather than damages). Once the legal question was resolved, the factual question of determining the actual date of the restoration period was well within the appraisal panel's scope. In *Duane Reade II,* the district court resolved the legal question by dismissing both sides' interpretations of the policy as extreme, concluding that, on the facts of that case, the appropriate scope of the restoration period was the "time it would take to rebuild, repair, or replace" the damaged property. 279 F.Supp.2d at 239.

In the case of Friends Restaurant the same problem occurs.  The umpire attempted to address a coverage question on what was the "period of restoration."

His interpretation of the period of restoration is not only incorrect, but it is not found anywhere in the policy.   Because the "period of restoration" is another legal issue of coverage, it should be left to the court to resolve its definition, and then factually determine the appropriate damage or loss for that policy section at the trial.

## IV.   BUSINESS INCOME

Next the policy also establishes what is considered Business Income. In Section A. Coverage, 1. Business Income,

Business Income means the:

a.  Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b.  Continuing normal operating expenses incurred, including payroll.

This combination of two sources is combined by the definition of Business Income.  It is not an alternative basis of calculation, but it is the combined sources of both Net Income **and** Expenses.  The Umpire award misinterprets the policy on this term, and again illustrates the limits of his charge, and the lack of authority to interpret policy language.

Once again this issue is one of a legal coverage issue and not one of a factual determination for an appraisal.  In the view of Patrick Gros, the restaurant's CPA, the dispute over whether to "subtract calculated period losses from continuing expenses has been continually disputed." (Exhibit D, page 2).  Although Gros suggests that definition of Business Income in the policy is "vague in this language," there can be no doubt that the definition considers a combination of profits and expenses, without any reduction of Calculated Losses from Continuing Expenses.

14

In the case of *St. Charles Parish Hospital, supra* at p. 759, Your Honor referred to the exact definition of "Business Income" in that policy as being "the net income…. as well as the normal operating expenses."   This combination of sources is consistent with the Lloyds policy, and is also consistent with standard practice in the industry. In fact when this question was posed to the agent that procured the policy for Friends, Wayne Solis at Ellsworth Corporation, the answer was the same, "The policy is also to cover your continuing operating expenses, the expenses that will not go away." (Exhibit E).   The Umpire's misreading of the definition of Business Income also illustrates the limits of his charge, and is an inappropriate issue for appraisal.   See *Duane Reade I, supra*.

In *St. Charles Parish Hospital,* this court also addressed the limits of appraisal as a method of "ascertaining facts," unlike the process of arbitration.   Your Honor further explained that the appraisal process was "not an adjudicative proceeding." Even on the simplest question of whether judicial interest on the recovery could be determined through appraisal, this court decided that it was for the court to determine, not the appraisers.   The interpretation of policy language on what is Business Income is one that is a legal question of insurance coverage, and one only for the court to determine. See *Bernard v. Ellis*, 111 So.3d 995, 1002 (La. 2012).   Questions of the definition of Business Income, which is a more significant legal question than determining judicial interest as discussed above, should certainly be reserved to the court for determination at trial.

Finally this court expressed that in order for the appraisal award to be confirmed by the court it must clearly appear that they have performed their duties as directed by

the policy. Your Honor stated, "the [Louisiana] Supreme Court has specifically held such stipulations for an appraisal are valid, but that the estimation is not binding on the parties in the event the appraisers and umpire fail to discharge their duty of ascertaining the 'actual cash value and loss'." *St. Charles Parish Hospital, supra,* at p. 763.  (Rejecting the appraisal award because the appraisers failed to list the damages as required under the policy).   In this case the umpire similarly failed to properly discharge his duty in rendering the decision on the proper definition of Business Income, and the court should also reject his award, and allow a full trial on the legal and factual dispute on the loss.

## V.    EXTENDED COVERAGE

In the final section of the decision by the umpire, he makes this statement:

> There is an extended loss period calculation provided by MDD for an additional three 28 day periods.  The insured is claiming that the loss period should continue beyond the 5/19/2013 extended loss period used by the MDD.  The policy we were provided included extended period coverage for a maximum of 30 days.  It appears additional extended period coverage may have been purchased for which we have not been provided the policy.

The full section of the policy that defines the Extended Business Income is found in section A.5.c. under the Business Income portion of the policy, and is quoted here:

> c.    Extended Business Income
>
> (1)    Business Income Other Than "Rental Value"
> If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:
>
> (a)    Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

16

(b)     Ends on the earlier of:

(i)     The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

(ii)    30 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

Once again, and like the issue of Period of Restoration above, the analysis here is first, one of a coverage interpretation rather than a factual one.   Next, it is unclear what portion of the policy the umpire was reviewing when he made the statement that it extends for a "maximum of 30 days," and then explained that he was "not provided a policy" for extended coverage.   And finally, the definition of extended coverage is provided in the policy section cited above, and shows that Friends purchased the extended coverage.   There was never any analysis by the umpire, and there was no agreement by the parties on the factual determination of when the extended coverage would continue.   As was expressed in the cases cited above most notably *Duane Reade I, supra*, and *St. Charles Parish Hospital, supra*, the legal questions of coverage are not appropriate for appraisal, and must be resolved by the court, as was subsequently done in *Duane Reade II, supra*.   The determination of the "extended coverage" is a legal issue and should therefore be reserved for the court at the trial of this matter and not through summary judgment.

17

## VI.    CLAIMS HANDLING AND PENALTIES

Lloyds has also sought to dismiss the claims of "bad faith" under the Louisiana insurance penalty statutes.  The facts will show that certain amounts were paid for the Restaurant's business loss previous to the appraisal, but that those payments were denied through delay.  Additionally the facts show that Lloyds established additional amounts owed, but delayed them until after appraisal.

The relationship between an insurer and its insured is one of a fiduciary obligation.  *Theriot v. Midland Risk Insurance Company*, 694 So.2d 184, 193 (La. 1997).  Indeed, an insurer owes to his insured a duty of good faith and fair dealing.  Additionally, the insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured.  LSA-R.S. 22:1973.

In the case of *Grilletta v. Lexington Insurance Company*, 558 F.3d 359 (5th Cir. 2009), the district court awarded the outstanding amounts owed under the homeowner's policy, and awarded penalties only on the outstanding amounts due.   Undersigned counsel appealed that decision.  The Fifth Circuit affirmed the district court's awarding of penalties on the outstanding amount, but further reversed and rendered judgment awarding additional penalties for the amounts previously paid, but that were paid late and in violation of the penalty statute.  Although Lloyds had paid amounts for Business Income previously, that same claim for penalties on previous and sporadic amounts paid should also be reserved until the time of trial.

Additionally as was stated above, the umpire rendered his decision and found that the insurance company's calculation of the business interruption claim for the primary loss period was "reasonably accurate," and awarded the amount suggested by Lloyds

18

appraiser. (Exhibit B. p. 9).  The additional amount owed and paid to Friends totaled $107,505.36.  The submission by Lloyds that it owed an additional $107,000.00 is certainly proof that Lloyds owed at least that amount to its insured.  The question that arises is when did Lloyds know that it would owe an additional $107,000.00, what was the basis for the basis for the denial, and why was it not tendered at the time the appraiser determined it to be due.  As the Supreme Court has directed, "An insurer's conduct depends on the facts known to the insurer at the time of its action."  *Louisiana Bag Co., Inc. v. Audubon Indem. Co.,* 999 So.2d 1104, 1114 (La. 2008).  The denial through delay of the payment of the additional $107,000.00 also exposes Lloyds to a penalty on that past amount like *Grilletta*, or at least leaves a question of fact on the recovery of penalties that should not be dismissed on summary judgment.

The umpire's decision also demonstrates Lloyds' violation of the penalty statutes by revealing that Lloyds failed to properly adjust the business income claim initially, and only did so after its insured demanded appraisal.  Had Lloyds adjusted the claim reasonably, there would have been no additional amounts owed through appraisal and the umpire's decision.  Instead, according to the umpire, the amount owed by Lloyds is exactly the amount that it thought it owed.  It is the decision of the claims handling process that ultimately will show the nature of the violation; however, the actions of Lloyds as presented demonstrate that there is a question of fact that precludes summary judgment on the penalty claims.

A similar factual situation to the present case arose in *Real Asset Management, Inc. v. Lloyd's of London*, 61 F.3d 1223 (5th Cir. 1995).  In that case, after a hurricane loss to the insured's property, the defendants were well aware "that there was legitimate

damage to the insured property directly and unequivocally resulting from the storm winds." Despite this knowledge, the defendants "unreasonably delayed the authorization to install a temporary roof." *Real Asset Management* at p. 1232. The basis of Lloyds' delay in that case was allowed to be tried, as should the basis of the Lloyds' delay in this case.

Pursuant to Louisiana's insurance penalty statutes, specifically, LSA-R.S. 22:1892, the plaintiff is entitled to pursue and recover the amounts claimed under the policy under its Business Loss policy. As a result of the wrongful denial through delay of the amounts owed, Lloyds will owe to the plaintiff a penalty of 50% on the outstanding amount, and in addition Lloyds also owes 50% on the amounts previously paid, but which were paid beyond the deadlines established by 22:1892 (30 days from satisfactory proof of loss).

The evidence will show that Lloyds breached its fiduciary duty to its insured, handled this claim in an arbitrary and capricious manner, and denied through delay the payment of the claim without any probable cause. Upon a showing of that evidence, and establishing such "bad faith," the assessment of penalties and attorneys' fee can be assessed under LSA-R.S. 22:1892 and 22:1973. Plaintiffs also recognize that penalties may be recovered under either statute, but that there cannot be duplicate penalties assessed. Because there exist questions of fact on the claims handling decisions of Lloyds in the payment, denial and delay, and adjusting methods, the summary judgment should be denied.

## VII.   STRUCTURE AND CONTENTS

Friends Restaurant has admitted in their response to the defendant's Statement of Uncontested Facts that the payments of structure amounts and contents amounts are no longer issues in the case.  The plaintiff therefore agrees to a judgment dismissing the structural and contents claims.  The only remaining claims are the Business Income loss as addressed above, and the penalty claims associated with that portion of the policy.

## VIII.   SUMMARY JUDGMENT STANDARD

Summary Judgment under rule 56 of the Federal rules of Civil Procedure is appropriate when "viewing the evidence in the light most favorable to the non-movant, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *Levy v. Phillips and Jordan Inc.,* No. 08-5065 2011 WL 2580592, *2 (E.D. La. June 29, 2011) *(Lemmon, J. (quoting Amburgey v. Corhart Refractories Corp.,* 366 F.2d 805, 809 (5th Cir. 1991); Fed. R. Cv. Pro. 56(c).  Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact.  "if the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue at trial.  *Id. (citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986.)  In this case the mover attempts to by-pass the court's jurisdictional authority over the appraisal process.  As has been shown above the umpire failed to properly discharge his duty in rendering the award, and the award should be rejected by the court in favor of a full trial with proper legal direction by the court.

### IX.    CONCLUSION

Appraisals best address factual disputes between and insurer and the insured. In most cases a dispute over square footage, unit costs of items such as sheet rock or door knobs can best be resolved through a collaborative effort between appraisers, and then an umpire for any remaining unresolved issues.  While the examination of contractor costs and measurements is not rocket science and can be readily resolved through appraisal, when the insurance dispute addresses more involved issues such as methods of accounting calculations or insurance policy questions of coverage, then the appraisal and umpire procedures should be more strictly examined.  The intersection of insurance coverage interpretation coupled with accounting measures creates legal issues that are best, if not exclusively, resolved by the court.  Unlike arbitration an appraisal does not usurp the court's authority over legal issues, and certainly the legal issues inherent in any insurance coverage analysis should not be removed from the court jurisdictional authority through a summary judgment.

For the reasons stated above, the complainant, Island Concepts, LLC d/b/a Friends Coastal Restaurant pray that the Motion for Summary Judgment be denied on all counts, except that of the issue surrounding payments of structural damage and contents.  Complainant further prays that the court reserve all of the insurance coverage issues, and penalty issues until a full trial on the merits.

**RESPECTFULLY SUBMITTED,**

**SHEARMAN~DENENEA, L.L.C.**

**/s/ John H. Denenea, Jr.**
**JOHN H. DENENEA, JR.  (Bar No. 18861)**
**BRIAN G. SHEARMAN (Bar No. 19151)**
4240 Canal Street
New Orleans, Louisiana 70119
Telephone:  (504) 304-4582
Facsimile:  (504) 304-4587
Email: jdenenea@midcitylaw.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to those participants in the CM/ECF filing system.

I further certify that there are no non-CMECF participants in this matter.

**/s /John H. Denenea, Jr.**
**JOHN H. DENENEA, JR.**