UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ISLAND CONCEPTS, LLC.                          CIVIL ACTION


VERSUS                                         NO: 13-6725


CERTAIN UNDERWRITERS AT LLOYD'S,               SECTION: R

LONDON


**ORDER AND REASONS**

Defendant, Certain Underwriters at Lloyd's, London, Subscribing to Policy Number 17-7590248903/Syndicate 4242 ("Lloyd's"), moves for summary judgment.[1]  For the following reasons, the motion is GRANTED.


I.    **BACKGROUND**

A.    **Factual Background**

This case arises out of an insurance dispute between plaintiff, Island Concepts, LLC, d/b/a Friends Coastal Restaurant ("Friends"), and defendant, its insurer.  During Hurricane Isaac, Friends sustained wind and water/flood damage to its property in Madisonville, Louisiana.  This property was insured by Policy Number 17-7590248903 issued by Lloyd's, which covered the period of June 5, 2012 to June 5, 2013.  The policy provided coverage with

---

[1]    R. Doc. 12.

limits of $1,000,000 for property damage to buildings, $600,000 for tenant betterments and improvements, and $1,200,000 for business income and extra expense.  By September 3, 2012, Lloyd's retained multiple experts to adjust the claim, including an independent field adjuster, a structural engineering group, and a certified public accountant.  During the adjustment, Lloyd's paid Friends the following sums: (1) $234,905.73, less a $28,000 deductible, for damage to the insured building; (2) $34,594.56 for the actual cash value of business personal property / tenants betterments and improvements; and (3) $335,372.64 for Business Income losses due to the peril of wind caused by Hurricane Issac.[2]  Lloyd's initially withheld depreciation from Friends in the amount of $12,967.06, which it tendered to Friends after receiving notice that Friends was in the process of rebuilding the insured building.

Disagreements between the parties developed during the adjustment and payment process.  Friends eventually invoked a provision of the insurance policy that becomes available when the parties cannot agree about the amount of a particular loss.  The appraisal provision contained within the "Business Income (And Extra Expense) Coverage Form" reads as follows:

> **1. Appraisal** If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.

---

[2]    R. Doc. 12-7 at 2.

2

> The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. . . .
>
> If there is an appraisal, we will still retain our right to deny the claim.[3]

Once this provision is applied, each party selects a competent and impartial appraiser who will eventually provide an opinion as to the amount of the loss. Before doing so, the two appraisers select an umpire to make the final decision. If the parties cannot agree on an umpire, they may move the Court to select one. Once a three-person panel is assembled, an appraisal award signed by any two "will be binding" on the parties.

Lloyd's selected Winston Wood as its appraiser, and Friends chose Patrick Gros. Together, Wood and Gros agreed to Charles Theriot as the umpire. Wood and Gros could not agree as to the correct amount for business income losses, and thus submitted the dispute to Theriot. On May 6, 2014, Theriot issued an award report, in which he concluded that Lloyd's' "calculation of the business interruption claim for the primary loss period is reasonably accurate. [Friends'] calculations for the preliminary loss period are not correct."[4] The award appraised Friends'

---

[3]    R. Doc. 12-3 at 33.

[4]    R. Doc. 14-5 at 9.

business income losses at $442,878, which was the sum proposed by Wood. Wood and Theriot both signed the appraisal award. Gros did not. On June 3, 2014, Lloyd's paid Friends $107,505.36, which was the difference between the appraisal award and the $335,372.64 Lloyd's had already paid to Friends for Business Income losses.

On August 27, 2013, Friends filed suit against Lloyd's, claiming additional sums for building losses, contents losses, and business interruption losses under its policy, as well as a claim for penalties, damages, and attorney's fees for bad faith under La. R.S. §§ 22:1973 and 22:1892. Lloyd's now moves for summary judgment on the grounds that (1) the completion of the binding appraisal process bars Friends' claims for additional sums for Business Income losses under the policy; (2) Friends has not provided any proof that it is owed additional sums for either building or contents losses under the policy; and (3) Lloyd's paid all sums due under the policy within 30 days of proof of loss of each component of the claim, making bad faith penalties under La. R.S. §§ 22:1973 and 22:1892 inappropriate. In its opposition, Friends concedes that building and contents losses are no longer issues in the case, and consents to the dismissal of those claims. Thus, only the claims for business income losses and bad faith penalties remain in the case.

**B.   Policy Provisions and Definitions**

4

The "Business Income (And Extra Expense) Coverage Form" of the policy provides:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.[5]

The policy defines **Business Income** as:

>    a.   Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
>
>    b.   Continuing normal operating expenses incurred, including payroll.[6]

The policy also provides that:

>    a.   The amount of Business Income loss will be determined based on:
>
>        (1)  The Net Income of the business before the direct physical loss or damage occurred;
>
>        (2)  The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;
>
>        (3)  The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of

---

[5]    R. Doc. 12-3 at 29.

[6]    *Id.*

5

> service that existed just before the
> direct physical loss or damage; and
>
> (4)  Other relevant sources of information,
>      including:
>
>      (a)  Your   financial   records and
>           accounting procedures;
>
>      (b)  Bill, invoices and other vouchers;
>           and
>
>      (c)  Deeds, liens or contracts.[7]

The policy defines **Extra Expense** as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss."[8] Regarding Extra Expense, the policy provides that:

> b.   The amount of Extra Expense will be determined
>      based on:
>
> (1)  All expense that exceed the normal
>      operating expense that would have been
>      incurred by "operations" during the
>      "period of restoration if no direct
>      physical loss or damage had occurred. . .
>      .
>
> (2)  Necessary expenses that reduce the
>      Business Income loss that otherwise would
>      have occurred.[9]

---

[7]   *Id.* at 34.

[8]   *Id.* at 29.

[9]   *Id.* at 34.

6

The policy defines **Period of Restoration** as the period of time that:

  a. Begins:

    (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

    (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

  b. Ends on the earlier of:

    (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

    (2) The date when business is resumed at a new permanent location.[10]

Regarding **Extended Business Income**, the policy provides:

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this poilcy, we will pay for the actual loss of Business Income you incur during the period that:

  (a) Begins on the date property . . . is actually repaired, rebuilt or replaced and "operations" are resumed; and

  (b) Ends on the earlier of:

    (i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have

---

[10] *Id.* at 37.

7

existed if no direct physical loss or
damage had occurred; or

(ii) 30 consecutive days after the date
determined in (1)(a) above.

The policy also provides that the number 30 in the provision regarding Extended Business Income shall be replaced with the number shown in any Declaration for an "Extended Period of Indemnity."[11] According to one of the Declaration Pages that form part of the policy, Friends purchased an "Extended Period of Indemnity" of 90 days that applies to Business Income losses.[12]

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but

---

[11]   *Id.* at 37.

[12]   *Id.* at 6.

"unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest

upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).


## III. DISCUSSION

Again, the insurance contract between the two parties contains the following provision in the "Business Income (And Extra Expense) Coverage Form":

> **1. Appraisal** If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.
>
> The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the amount of Net Income and operating expense or amount of loss.  If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. . . .
>
> If there is an appraisal, we will still retain our right to deny the claim.[13]

---

[13]     R. Doc. 12-3 at 33.

The provision explicitly states that a "decision agreed to by any two *will be binding*."

Appraisal clauses such as these are enforceable under Louisiana law. *See St. Charles Parish Hosp. Serv. Dist. No. 1 v. United Fire & Cas. Co.*, 681 F. Supp. 2d 748, 753 (E.D. La. 2010); *Newman v. Lexington Ins. Co.*, No. 06-4668, 2007 WL 1063578, at *2 (E.D. La. Apr. 4, 2007); *Fourchon Docks, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 86-2267, 1988 WL 32938, at *8 (E.D. La. Apr. 6, 1988); *Sevier v. U.S.F. & G.*, 485 So. 2d 132, 135-36 (La. Ct. App. 1986), *rev'd on other grounds*, 497 So. 2d 1380 (La. 1986); *Girard v. Atlantic Mut. Ins. Co.*, 198 So. 2d 444, 445-47 (La. Ct. App. 1967); *Martin v. Home Ins. Co.*, 133 So. 773, 776 (La. Ct. App. 1931). They do not, however, deprive a court of jurisdiction over the matter. *St. Charles Parish Hosp.*, 681 F. Supp. 2d at 753; *Newman*, 2007 WL 1063578, at *2; *Fourchon Docks*, 1988 WL 32938, at *8; *Girard*, 198 So. 2d at 446.

The Louisiana Civil Code sets forth the guiding principles for construing contracts in Louisiana. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007); *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003). "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045 (2013). Such intent is to be derived from the language of the contract itself. If that language is "clear and explicit and lead[s] to no absurd consequences, no

11

further interpretation may be made in search of the parties' intent." *Id*. art. 2046. Words "must be given their generally prevailing meaning," and terms of art are interpreted as such only when a technical matter is at stake. *Id*. art. 2047. Furthermore, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Id.* art. 2045.

To the extent that ambiguous terms appear in an insurance contract, they "are to be construed liberally in favor of a person claiming coverage." *Westerfield v. LaFleur*, 493 So. 2d 600, 602-03 (La. 1986); *see also* La. Civ. Code art 2056 ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party."); *Arctic Slope Regional Corp. v. Affiliated FM Ins. Co.*, 564 F.3d 707, 709-10 (5th Cir. 2009) (ambiguities in insurance contracts are "to be construed against the insurer and in favor of coverage") (quoting *Sher v. Lafayette Ins. Co.*, 988 So. 2d 186, 193 (La. 2008)); *see also Herbert v. Webre*, 982 So. 2d 770, 774 (La. 2008).

In addition, appraisal provisions in insurance contracts are strictly construed. *Branch v. Springfield Fire & Marine Ins. Co.*, 4 So. 2d 806, 809 (La. 1941). An appraisal award issued under an insurance policy is binding only if the appraisers "have performed

the duties required of them by the policy, which is the law between the contracting parties." *Id.*; *see also St. Charles Parish Hosp.*, 681 F. Supp. at 754; *Prien Props., LLC v. Allstate Ins. Co.*, No. 07-845, 2008 WL 1733591, at *2 (W.D. La. Apr. 14, 2008); *Fourchon Docks*, 1988 WL 32938, at *8. Contractually specified appraisal awards are presumed accurate. *See In re Waters*, 93 F.2d 196, 200 (5th Cir. 1937) (surveying cases from numerous jurisdictions to determine that "every reasonable intendment and presumption is in favor of an award of appraisers selected to determine the value of property lost"). Further, as the policy explicitly states that "[a] decision agreed to by any two *will be binding*," the burden of demonstrating that the award should not be confirmed must fall upon the party challenging it. *See* La. Civ. Code arts. 1983, 2045-46; *St. Charles Parish Hosp.*, 681 F. Supp. at 754.

Lloyd's argues that because Friends requested the binding appraisal, and because the appraisal process has concluded and Friends has been paid in accordance with the appraisal, Friends is now bound by the appraisal award. If Lloyd's is correct, then Friends may not seek sums for Business Income losses in excess of the award, and Lloyd's is entitled to summary judgment on Friends' breach of contract claim. In response, Friends argues that the appraisal award should not be binding because the appraisers and umpire exceeded their authority by determining questions of coverage, which are reserved to the Court. Specifically, Friends

13

identifies four issues that it contends are "coverage issues" that the Court must decide.  First, Friends argues that because the policy does not specify a particular accounting methodology to be used to determine Business Income losses, the Court must provide direction as to which accounting method the parties should use before an appraisal award can be valid.  Second, Friends argues that the umpire did not follow the policy's definition of Business Income when calculating the appraisal award.  Third, Friends argues that the determination of the appropriate "period of restoration" is a coverage question that the appraisers and umpire did not have authority to decide.  Fourth, Friends argues that the determination of the correct period for "Extended Business Income" coverage is a coverage question that the appraisers and umpire not only lacked the authority to decide, but also decided inconsistently with the policy.  These challenges will be addressed in turn.

### A.   Choice of Accounting Method

Lloyd's CPA, Wood, and Friends' CPA, Gros, utilized different accounting methods to calculate the Business Income loss estimates that they submitted to the umpire, Theriot.  Theriot agreed with and adopted the method used by Wood, which sought to account for seasonality, and rejected the method used by Gros, which did not. As Theriot explained in the appraisal award:

> The insured failed to account for seasonality in their
> calculations, applying the profits from 2011 plus 2.83%

14

> evenly to the loss period. The loss period includes the
> slower periods of the year. The business is very seasonal
> . . . with losses typically experienced in periods 9-13
> and periods 1-2 of each year.[14]

Friends argues that because the policy does not specify a particular accounting methodology to be used to determine Business Income losses, the Court must provide direction as to which accounting method the parties should use before an appraisal award can be valid. Friends also contends that the method utilized by Wood and adopted by Theriot was "flawed" because, according to an opinion letter by Friends' CPA, Gros, the method used by Lloyd's "required several assumptions concerning normal revenues and expenses, contracts and variations."[15]

Under Louisiana law, appraisal awards enjoy a presumption of correctness. *See In re Waters*, 93 F.2d at 200. Thus, this Court has held that "a court should not disrupt an appraisal award simply because reasonable minds could differ as to the amount awarded *or the methods employed*." *St. Charles Parish Hosp.*, 681 F. Supp. 2d at 760 (emphasis added). Nevertheless, "[a] court . . . is not bound to confirm an award that contains clear mistakes of fact." *Id.*

Gros's opinion letter does not support a conclusion that Wood or Theriot made a clear mistake of fact in their choice of

---

[14]    R. Doc. 14-5 at 5 n.5.

[15]    R. Doc. 14 at 9.

15

accounting method.  Rather, his letter specifically admits that the method used by Wood "can be a reasonable approach," although "it has some flaws."[16]  One flaw, according to Gros, is that Wood's method requires various "assumptions" that necessitate a "detailed explanation by the Client . . . or else the values will be distorted."[17]  Another alleged flaw is that "when several disaster claims . . . have occurred over the look back period, it is extremely difficult to determine what normal business income or loss should be."[18]  Neither of these alleged flaws rises to the level of a clear mistake of fact.  In addition, both of Gros's proposed alternative methods rely upon historical data from the years immediately preceding Hurricane Isaac, just as Wood's method does.[19]  Thus, it is not clear that the two alternative methods Gros suggests would not be equally susceptible to problems related to disaster claims during the look back period.

The most that Gros's letter establishes is that there was a difference in professional opinion between the members of the appraisal panel about the best accounting method to use.  Even if "reasonable minds could differ as to . . . the methods employed," reasonable differences in opinion are not a sufficient reason to

---

[16]    R. Doc. 14-6 at 3.

[17]    *Id.*

[18]    *Id.*

[19]    *See id.* at 4.

overturn a binding appraisal award.  *Id.; see also La Louisiane Bakery Co. v. Lafayette Ins. Co.*, 61 So. 3d 17, 34 (La. Ct. App. 2011) ("The use of a specific base period is a judgment call dependent upon the type of business. Therefore, two individuals performing a calculation could arrive at different figures."). Accordingly, Friends cannot defeat summary judgment on the ground that its appraiser disagrees with the accounting method utilized by Lloyd's appraiser and approved by the umpire.

### B.   Method of Calculating Business Income

Second, Friends challenges the award on the grounds that the appraisers improperly deducted Net Losses from Continuing Expenses when calculating Business Income losses.[20]  Friends argues that this method was inconsistent with the policy's definition of Business Income.  Friends is incorrect.

The policy defines **Business Income** as:

> a.   Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
>
> b.   Continuing normal operating expenses incurred, including payroll.[21]

Courts interpreting similar policy language under Louisiana law have construed the "and" to indicate that addition--or, when a

---

[20]   R. Doc. 14 at 14.

[21]   R. Doc. 12-3 at 29.

business is operating at a loss, subtraction--is necessary to calculate "Business Income." *See, e.g.*, *United Land Investors, Inc. v. Northern Ins. Co. of America*, 476 So.2d 432, 436 (La. Ct. App. 1985) (finding that a similar policy provision unambiguously required deducting net losses from operating expenses when a business was operating at a loss); *B.F. Carvin Const. Co. v. CNA Ins. Co.*, No. 06-7155, 2008 WL 5784516, at *2 (E.D. La. July 14, 2008) ("[T]he proper calculation consists of adding 'Net Income ...and [c]ontinuing normal operating expenses.'"); *Shelter Mutual Ins. Co. v. Culbertson's Limited, Inc.*, No. 97-1609, 1999 WL 461826, at *5 (E.D. La. July 2, 1999) ("Clearly, if a company were not making a profit, as was the case apparently from the numbers presented, then there are 'expenses' which a company has paid out, that it has not 'earned.'").

The Court also finds persuasive the reasoning of the Supreme Court of Tennessee, which interpreted a Business Income provision identical to that in the Lloyd's policy in *Continental Insurance Co. v. DNE Corp.*, 834 S.W. 2d 930 (Tenn. 1992). As that court explained:

> It seems obvious to us from the wording of the policy that in any given case, the amount of "business income" will be a number that is the sum of a second number ("net income," which may be either a net profit or a net loss) and a third number (continuing normal operating expenses incurred). The "business income" provision of the policy clearly indicates that the amount of business income is to be determined by adding the second number and the third number together, and not . . . by looking only to

18

> the third number and completely ignoring the second number.

*Id.* at 932. The Court concludes that when, as here, the business was operating at loss, the proper calculation consists of adding the negative "Net Income"--that is, the "Net Loss"--to the "continuing normal operating expenses." In other words, the Net Loss must be deducted from continuing expenses to arrive at a figure for Business Income loss that is consistent with the policy. This is precisely what Wood and Theriot did.

This method is also consistent with the purpose behind business interruption insurance, which is to "protect the earnings which the insured would have enjoyed had no interruption or suspension occurred." *La Louisiane Bakery Co.*, 61 So. 3d at 34 (citing *Yount v. Lafayette Ins. Co.*, 4 So.3d 162, 171 (La. Ct. App. 2009). As stated in *United Land Investors*, "[a]lthough the policy is designed to protect the insured, it is also designed to prevent the insured from being placed in a better position than if no loss or interruption of business had occurred." 476 So. 2d at 436; *see also* Steven Plitt, Daniel Maldonado, Joshua D. Rogers & Jordan R. Plitt, 12 Couch on Insurance § 185:1 ("The essential nature and purpose of business interruption insurance is to protect the earnings which the insured would have enjoyed had there been no interruption of the business; in other words, the purpose of business interruption coverage is to do for the business what the business would have done for itself had no interruption occurred.

19

. . . *Note that this goal means that if the business was operating at a loss, there might be no recovery under the policy.*" (emphasis added)).  Because the Court finds that the policy unambiguously sets out a method for calculating Business Income, and because Wood and Theriot calculated Business Income consistently with that method, Friends cannot defeat summary judgment on this ground.


**C.   Determination of Period of Restoration**

Third, Friends argues that the determination of the appropriate "period of restoration" is a coverage question that the appraisers and umpire did not have authority to decide.  The Court's review of the case law did not reveal any Louisiana authority directly addressing the question of whether the determination of a "period of restoration" under a business interruption policy is a question of fact appropriate for appraisers or a coverage question reserved to the Court.  Courts in other jurisdictions, however, have held that the period of restoration determination should be made by the appraisal panel.

For example, the Eastern District of Michigan recently considered a policy that provided that "business interruption loss 'shall be adjusted on the basis of the actual loss sustained by the insured, during the period of restoration.'"  *UrbCamCom/WSU I, LLC v. Lexington Ins. Co.*, No. 12-CV-15686, 2014 WL 1652201 (E.D. Mich. Apr. 23, 2014).  The court held that "[b]y incorporating the

20

'period of restoration' requirement into the business interruption loss provision, the policy provides that the actual loss determination *necessarily* includes valuation of the period of restoration." *Id.* (emphasis added). In other words, the appraisal panel could not do its job of valuing the loss without determining the period of restoration. The Tennessee Court of Appeals applied similar reasoning in *Artist Building Partners v. Auto-Owners Mutual Insurance Co.*, 435 S.W.3d 202, (Tenn. Ct. App. 2013). There, the court explained that "[p]ursuant to the insurance policy, the [appraisal] panel was authorized to make a binding determination as to 'the amount of loss,'" and this determination "*necessarily* included a determination of the applicable period of restoration." *Id.* at 218-19 (emphasis added).

Here, as in *UrbCamCom* and *Artist Building Partners*, the plain language of the policy requires the appraisers to determine the "period of restoration." The policy provides: "We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'"[22]   Thus, it would have been impossible for the appraisal panel to complete its task of determining "the actual loss of Business Income" suffered by Friends without making a factual determination as to the appropriate period of restoration.

---

[22]     R. Doc. 12-3 at 29.

Friends cites *Duane Reade, Inc. v. St. Paul Fire & Marine Insurance Co. (Duane Reade I)*, 261 F. Supp. 2d 293 (S.D.N.Y. 2003), and *Amerex Group, Inc. v. Lexington Insurance Co.*, 678 F.3d 193 (2d Cir. 2012), for the proposition that appraisers may not make a factual determination regarding a period of restoration. Neither case support its position. As the Second Circuit explained in *Amerex*, in *Duane Reade I*, the parties disputed whether an insured pharmacy located near the World Trade Center was entitled to recover business interruption losses incurred after the September 11, 2011 terrorist attacks through the entire period until the World Trade Center would be rebuilt (if it ever would be), or if the pharmacy's recoverable losses were limited to those suffered within 21 months of the terrorist attacks. *See Amerex*, 678 F.3d at 205. "Thus, the argument in *Duane Reade I* did not concern the factual determination of the restoration period's end date, but whether the policy calculated that period with reference to an exogenous event--the reconstruction of the World Trade Center." *Id.* Although the "district court in *Duane Reade I* appropriately reserved the determination of that legal dispute for itself, rather than delegating it to an appraisal panel," "[o]nce the legal question was resolved, the factual question of determining the actual date of the restoration period was well within the appraisal panel's scope." *Id.* Indeed, once the Southern District of New York had "clarified the scope of the period of restoration within

22

the meaning of the policy, defining that specific period was a sufficiently factual question to allow resolution by the appraisal panel." *Id.*

Here, the policy clearly defines the period of restoration. The period of restoration begins "72 hours after the time of direct physical loss or damage for Business Income Coverage" and "immediately after the time of direct physical loss or damage for Extra Expense Coverage" and continues until the earlier of "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or . . . [t]he date when business is resumed at a new permanent location."[23]   Friends does not challenge the scope-of-coverage afforded by the policy's definition.   Rather, Friends contends that the calculation of the actual period of restoration is not a factual question but a coverage question.   The Court does not agree.   It holds that where the policy clearly defines the covered period of restoration, the calculation of that period, "unless subject to legal challenges, is a factual question about damages." *Amerex*, 678 F.3d at 205.   Thus, it is both an appropriate and necessary determination for the appraisal panel to make.

Appraisal awards issued under an insurance policy are binding if the appraisers "have performed the duties required of them by

---

[23]    *Id.* at 37.

the policy, which is the law between the contracting parties." *Branch*, 4 So. 2d 806. Here, under a heading titled "Primary Restoration/Loss Period," the appraisal award states: "The definition contained within the insurance policy provides a primary loss period to February 24, 2013, a period of 177 days or 5.86 months."[24] This statement indicates that the appraisal panel applied the policy's definition of the period of restoration to arrive at a factual determination of the time it would take for "the property at the described premises [to] be repaired, rebuilt or replaced with reasonable speed and similar quality." In light of the presumption of accuracy enjoyed by contractually specified appraisal awards, *see In re Waters*, 93 F.2d at 200, the Court finds nothing in the appraisal panel's statement to undermine its conclusion that the appraisal panel calculated the period of restoration in keeping with the policy's definition. Thus, Friends may not defeat summary judgment on this ground.

### D.    Determination of Extended Coverage Period

Fourth, Friends contends that the determination of the correct period for "Extended Business Income" coverage is a coverage question that the appraisers and umpire not only lacked the authority to decide, but also decided inconsistently with the policy.

---

[24]    R. Doc. 14-5 at 7.

24

First, Friends is incorrect that the actual calculation of the extended coverage period according to the policy's definition is a coverage rather than a factual question.  There is no reason that the Court's analysis regarding the calculation of the appropriate period of restoration should not also apply to the calculation of the appropriate extended coverage period.  Accordingly, when the policy clearly defines the covered period, the calculation of that period, "unless subject to legal challenges, is a factual question about damages." *Amerex*, 678 F.3d at 205.  Here, just as with the period of restoration, the plain language of the policy requires the appraisers to determine the extended coverage period in order to calculate an estimate for "Extended Business Income."  The Extended Business Income section of the policy provides: "If the necessary 'suspension' of your 'operations' produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the [extended coverage] period."[25]  Thus, it would have been impossible for the appraisal panel to complete its task of determining "the actual loss of Business Income" payable as Extended Business Income without making a factual determination as to the appropriate extended coverage period.

In addition, the policy clearly defines the extended coverage period.  It provides that the extended coverage period runs from

---

[25]    R. Doc. 12-3 at 31.

25

the date that the property is repaired and operations are resumed through the earlier of the "date you could restore your 'operations', with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or . . . [90] consecutive days after the date [operations were resumed]." The outer limit of "[90] consecutive days" reflects sixty additional days of coverage purchased by Friends, as indicated by one of the Declaration Pages that form part of the policy. That Declaration Page provides that Friends purchased an "Extended Period of Indemnity" of 90 days to apply to Business Income losses.[26] Because the policy clearly defines the extended coverage period, calculating the extended coverage period based on that definition was an appropriate and necessary factual determination for the appraisal panel to make.

Second, Friends is incorrect that the extended coverage period adopted by the umpire is inconsistent with the policy's definition. Friends takes issue with two statements by the umpire regarding the extended coverage period. First, the umpire states: "It is not apparent whether the insured, in fact, purchased or was entitled to recover additional business interruption lost profits for the extended restoration/loss period."[27] Second, the umpire states:

---

[26]    R. Doc. 12-3 at 6.

[27]    R. Doc. 14-5 at 7.

"The policy we were provided included extended coverage for a maximum of 30 days. It appears additional extended period coverage may have been purchased for which we have not been provided the policy."[28]   It is true that these statements by the umpire are inconsistent with the policy.   As discussed above, the policy indicates that Friends purchased additional extended coverage that extended its extended coverage period from 30 to 90 days.   The umpire's inaccurate statements could be explained by the umpire's failure to notice the additional coverage indicated by the Declaration Page.  Regardless of how the mistake came to be, if the umpire based the award on an erroneous understanding of the policy definition, then the award may not be upheld.  Ultimately, however, the umpire did not base the award on this misunderstanding.

Both Friends and Lloyd's submitted estimates for Extended Business Income to the umpire.  Friends' estimate was higher.  Both estimates were based on an extended coverage period longer than 30 days.  In the end, the umpire adopted the estimate for Extended Business Income suggested by Lloyd's, which was based upon an extended coverage period of "February 25, 2013 through May 19, 2013, a period of 84 days or 2.83 months."[29]  As the umpire explained in the award, "It appears additional extended period coverage may have been purchased for which we have not been

---

[28]   *Id.* at 8.

[29]   *Id.* at 7.

27

provided the policy." Thus, despite his own misunderstanding about the correct outer limit for the extended coverage period, the umpire accepted Lloyd's proposed extended coverage period, which was consistent with the policy. That the umpire accepted an estimate based upon an extended coverage period that extended well past 30 days indicates that the umpire did not ultimately limit the Extended Business Income award based on his misunderstanding. In addition, 84 days is toward the outer limit of the 90-day maximum extended coverage period provided by the policy. The Court has no reason to doubt that 84 days is a reasonable estimate of how long it would take for operations to be restored, "at reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred." Thus, in light of the presumption of accuracy enjoyed by contractually specified appraisal awards, *see In re Waters*, 93 F.2d at 200, the Court sees nothing to suggest that the appraisal panel based its award for Extended Business Income upon an extended coverage period inconsistent with the policy's definition. Because the award is consistent with the policy, Friends cannot defeat summary judgment on this ground.


### G.  Bad Faith

Louisiana law authorizes the recovery of bad faith penalties from insurers who fail to pay legitimate claims under two nearly

identical provisions. *See* La. Rev. Stat. §§ 22:1892, 22:1973. Under section 22:1892(A)(1), "all insurers . . . shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured."  If an insurer refuses to pay a claim within thirty days of receiving satisfactory proofs of loss, and its failure to do so is found to be "arbitrary, capricious, or without probable cause," then section 22:1892(B)(1) provides that the insurer is subject to pay a penalty equal to 50% of the loss, or one thousand dollars, whichever is greater.  Section 22:1973 imposes on insurers "a duty of good faith and fair dealing" and provides for penalties if an insurer fails to pay a claim within sixty days after receipt of satisfactory proof of loss when "such failure is arbitrary, capricious, or without probable cause."  La. Rev Stat. §§ 22:1973(A), 22:1973(B)(5).  "A plaintiff may be awarded penalties under only one of the two statutes, whichever is greater." *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 297 (5th Cir. 2009).  Nonetheless, a plaintiff may recover attorneys' fees under section 22:1892 while seeking damages and penalties under section 22:1973.  *Id.*

To recover under either statute, the plaintiff must demonstrate that the insurer (1) received a satisfactory proof of loss; (2) that the insurer failed to pay within the designated time period, and (3) that the failure to pay was arbitrary, capricious or without probable cause.  *See Boudreaux v. State Farm Mutual*

*Automobile Ins. Co.*, 896 So. 2d 230, 233 (La. Ct. App. 2005); *see also Reed*, 857 So. 2d at 1020.   The phrase "arbitrary and capricious" means "[v]exatious" or "unjustified, without reasonable or probable cause or excuse." *Dickerson*, 556 F.3d at 297 (quoting *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So. 2d 1012, 1021 (La. 2003)).   "An insurer does not act arbitrarily and capriciously . . . when it withholds payment based on a genuine (good faith) dispute about the amount of a loss or the applicability of coverage." *Id.* at 297-98 (citing *Calogero v. Safeway Ins. Co. of La.*, 753 So. 2d 170, 173 (La. 2000)).   "Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action . . . ." *Reed*, 857 So. 2d at 1021.

Lloyd's moves for summary judgment on Friends' bad faith claims, and submits in support of its motion an affidavit from Dwight Powell, a Lloyd's Loss Specialist familiar with Friends' claim.[30]   Powell's affidavit details the dates upon which Lloyd's tendered to Friends (1) advance payments for loss of income and loss of business personal property; (2) payment for building damages; (3) rolling payments for loss of Business Income; and (4) payment of the additional Business Income sum awarded in the appraisal.[31]   Lloyd's argues that Friends has presented no evidence

---

[30]   R. Doc. 12-2.

[31]   *Id.* at 1-2.

that any of these sums were not timely paid upon receipt of proof of loss or the conclusion of the appraisal process.[32]

In response, Friends first argues that "the facts will show" that some of the payments it received were "denied through delay."[33] Because Friends has the burden of proof on its bad faith claims, *see Reed*, 857 So. 2d at 1020, its failure to identify specific facts currently in the record in support of its claim that Lloyd's payments were untimely is insufficient as a matter of law to satisfy its burden on summary judgment, s*ee Celotex*, 477 U.S. at 325.

Friends next argues that Lloyd's "established additional amounts owed, but delayed them until after appraisal."  Friends argues that because Lloyd's submitted an estimate to the appraisal panel indicating that an additional $107,000 was owed, there is a question of material fact as to why Lloyd's did not tender this sum to Friends immediately when its appraiser determined it to be due.[34] The Louisiana Fourth Circuit encountered a similar fact pattern in *Long v. American Security Insurance Co.*, 52 So. 3d 260 (La. Ct. App. 2010).  There, the insurance company tendered an initial payment of approximately $50,000 for dwelling and other structure damages to Long's home following Hurricane Katrina.  *Id.* at 261.

---

[32]    R. Doc. 12-6 at 10.

[33]    R. Doc. 14 at 18.

[34]    *Id.* at 19.

Dissatisfied with this payment, Long invoked his policy's appraisal process. *Id.* at 261-62. The appraiser for the insurance company submitted an estimate suggesting that an additional $116,932.10 was owed. *Id.* at 262. Several months later, the umpire entered an award above the policy limits. *Id.* Within one month of the appraisal award, the insurance company tendered the policy limits to Long. *Id.* The court observed that the insurance company had "fully complied with the appraisal clause of the insurance policy" and "tendered Mr. Long's dwelling policy limits within thirty days of the umpire's ruling." *Id.* at 264. On these facts, the court affirmed the trial court's grant of summary judgment on Long's bad faith claims because Long had failed demonstrate that the insurer had acted "in an arbitrary and capricious manner and without probable cause." *Id.* As the court explained: "[C]omplying with a contracted and self-invoked appraisal process fails to provide evidence or factual proof of vexatious, arbitrary, capricious, or conduct without probable cause." *Id.; see also W. Consol. Premium Properties, Inc. v. Westchester Surplus Lines Ins. Co.*, No. 06-4845, 2011 WL 6300334 (E.D. La. Dec. 16, 2011) (insurance company entitled to summary judgment on bad faith claims when it "paid plaintiffs the amount due under the appraisal award well within the statutory period mandated under La. Rev. Stat. 22:1892 and 22:1973").

32

As in *Long*, Lloyd's made an initial tender to Friends for Business Income losses for an amount lower than that the sum eventually calculated by its appraiser, Wood, and affirmed through the appraisal process. Then, as in *Long*, once the appraisal process was complete, Lloyd's tendered to Friends the full additional sum settled by the appraisal award within thirty.

This case may be easily distinguished from the decision of the Louisiana Fifth Circuit in *Willwoods Community v. Essex Insurance Co.*, 33 So. 3d 1102 (La. Ct. App. 2010), which held that an insurer's failure to tender within thirty days the full amount estimated by its own appraiser during an appraisal process could support a finding of bad faith. The *Williwoods* court based its decision partly on the insurer's "unconditional tender" of additional funds based solely on the estimate of its appraiser and prior to the entry of the final appraisal award. The unconditional tender supported the inference that the insurance company did not truly question whether the additional sums were due. *Id.* at 1111. Moreover, the record in *Williwoods* included a letter by the insurance company's appraiser in which he indicated that his assessment was "supported by the overwhelming weight of evidence." *Id.* Here, unlike the insurer in *Williwoods* and like the insurer in *Long*, Lloyd's waited until the conclusion of the appraisal process to tender any additional sums. This supports the conclusion that the sums that were the subject of the appraisal were genuinely

33

disputed.  "When there is a reasonable and legitimate question as to the extent . . . of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist." *Id.* (citing *Reed*, 857 So. 2d at 1020).  Thus, the Court concludes that like in *Long*, Lloyd's compliance with the contractual appraisal process does not provide evidence of bad faith.  Because Friends has pointed to no evidence indicative of its ability to prove at trial that Lloyd's acted with bad faith, Lloyd's is entitled to summary judgment with regard to Friends' bad faith claims.


## IV. CONCLUSION

For the foregoing reasons, defendant's motion is GRANTED. Friends' claims are DISMISSED.


New Orleans, Louisiana, this ___31st___ day of October, 2014.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE